IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 31, 2013

**IN RE: ALICIA K.A.**

**Appeal from the Juvenile Court for Knox County**
**No. 112656      Timothy E. Irwin, Judge**

**No. E2012-02614-COA-R3-PT-FILED-JULY 8, 2013**

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Linda J.M.A. ("Mother") to the minor child Alicia K.A. ("the Child")[1]. After a trial, the Juvenile Court entered its Termination of Parental Rights and Final Decree of Guardianship finding and holding, *inter alia*, that clear and convincing evidence had been proven that grounds existed to terminate Mother's parental rights under Tenn. Code Ann. §§ 36-1-113(g)(1), (g)(3), and (g)(8), and that the termination was in the Child's best interest. Mother appeals the termination of her parental rights to this Court. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY, and THOMAS R. FRIERSON, II, JJ., joined.

Heather G. Inman, Knoxville, Tennessee, for the appellant, Linda J.M.A.

Robert E. Cooper, Jr., Attorney General and Reporter; and Marcie E. Greene, Assistant Attorney General for the appellee, State of Tennessee Department of Children's Services.

---

[1]The petition also sought to terminate Mother's parental rights to the minor child Anastasia N.W. At the beginning of the trial Mother voluntarily surrendered her parental rights to Anastasia N.W., and no issues involving Mother's surrender of her parental rights to Anastasia are involved in this appeal.

# OPINION

## Background

DCS filed the petition seeking to terminate Mother's parental rights to the Child in June of 2012. The case was tried in November of 2012.

Mother testified at trial that she and the Child's father, Thomas W., never were married. Mother was married to another man, Alvin A., at the time the Child was born in November 2010. Mother married Alvin A. in 2006, and she and her husband were living in her husband's parents' home. At the time of trial, Mother still was married to Alvin A. The parental rights of Alvin A. and those of Thomas W. to the Child were terminated prior to the trial in this case.

Mother was asked about her prior involvement with DCS, and she stated: "Someone had called in and said I had another child and was living in an unfit place for it." Mother agreed that DCS investigated this claim in 2007, and that Mother told DCS that she had miscarried a child named Baby Alvin at Fort Sanders. Mother also told DCS she had a child named Misty D.M. Mother stated: "Yeah, but her last name wasn't [M.], it was a baby that I was keeping when I should have been going to school." Mother was asked whether she had told DCS during the investigation that Misty had been shaken to death by her father, and Mother stated: "I remember saying something about a baby that was shaken, but I don't think it was Misty." Mother also told DCS that she had given birth to a boy named Danny R.M. Mother stated: "That was to make someone feel sorry for my mother, yes.… Yes. I told a lie and I shouldn't have, yes." Mother agreed that DCS was unable to locate any of these children. DCS closed the investigation, and no action was taken because Mother had no children at that time.

DCS again become involved with Mother when Mother gave birth to the Child's older sister, Anastasia, in 2009 due to stories told at the hospital. With regard to these stories, Mother stated: "I didn't tell them, [Thomas W.] told them but, yes, those stories did come up." Mother admitted that Thomas W. had reported that Mother had five miscarriages and gave birth to four other children who had died. Mother stated: "I didn't tell the hospital that," and further stated: "I told [Thomas W.] I had other children because he wanted children and he said if I couldn't have them, then we would not be together." Mother was asked about the fact that she had told the same story to DCS two years before she was involved with Thomas W., and she stated: "No. I did tell the story but, like I said, it was a lie that should have never been said." Mother also admitted that Thomas W. also talked about Misty being shaken to death.

-2-

Prior to giving birth to Anastasia, Mother was being treated for mental health issues. Mother stated the treatment was "due to stuff that happened when I was a child." She testified that she was treated at Helen Ross McNabb "for several years." Mother admitted that while being treated at Helen Ross McNabb she told stories about having children. She stated:

> I was taking care of everybody else's child and I just said they had my last name, yes, I did because I was the one taking care of them, their parents wasn't. And I was really attached to them and I wanted a child so, yes, I did say they were mine.

Mother recalled telling people at Helen Ross McNabb that she had been sexually assaulted by her brother, that her mother had substance abuse issues, and that her father also had mental health and drug and alcohol issues. She also told them that her mother was married to a man who physically abused Mother and her brother.

Mother also had reported that her husband was abusive. She stated: "He was on drugs really bad and it was more mental abuse than anything that I had to deal with." Mother testified that her husband was not physically abusive, just mentally abusive. Mother testified that although she and her husband separated in 2008, they still are married.

Mother met Thomas W. in May of 2008. Mother was asked when Thomas W. first became violent with her, and she stated: "When I found out I was pregnant with Anna." She stated that Thomas was violent with her while she was pregnant "[t]owards the end of it, yes, ma'am." She also stated he "[m]ainly choked me, that was pretty much it. It didn't get really bad until after I found out I was pregnant with [the Child]." Anastasia was taken from Mother the day after her birth and has remained in DCS custody since that time.

Mother didn't have very much hair when she arrived at the hospital to give birth to Anastasia. Mother testified: "I was stressed out towards the end of my pregnancy and [Thomas W.] would pull strings of hair out of my head. He claimed that they were split ends and it drove him crazy to look at it.… There was spots that was bald. I had like two big bald spots in my head from where he pulled my hair out of my head." Mother testified that he started pulling out her hair the day she found out she was pregnant with Anastasia. Mother told DCS "that I was severely stressed out and my hair was falling out. I did not tell them that [Thomas W.] pulled my hair out." Mother testified that Thomas W. "used pills and marijuana and drunk alcohol several times while we were together.… He did it - - after Anastasia was born, things got worse, and when he did it, he was mixing Klonopins and beer together, and it made him go crazier."

Mother still was involved with Thomas W. when the Child was born. She stated: "I was too stupid to leave." Mother admitted that Thomas W. was violent toward Mother while she was pregnant with the Child. Photographs depicting injuries inflicted upon Mother by Thomas W. were introduced as exhibits at trial. Mother admitted that she initially did not tell DCS that Thomas W. had inflicted these injuries. She stated: "because I didn't know that I could tell someone and get something done. At the time I was too scared to say anything." Mother admitted that during one of her unsupervised visitations with Anastasia, Thomas W. "busted me on my nose." Mother also admitted that she made up a story and "said a black man assaulted me when I was walking to a Coke machine because that's what [Thomas W.] wanted me to say when the police was called that night." Mother also testified that Thomas W. allowed someone else to rape her. She stated: "When I was two months pregnant with [the Child], I was raped." Mother was asked if she did anything about this and she stated: "No, because I was too scared to. And that was before I took any classes, didn't know that it wasn't right for a guy to do what happened to me." Mother testified that she has a mark on her back "that's the stab mark that I got when I was protecting [the Child] from her father." She stated: "I got stabbed in the back protecting my child."

Mother finally told DCS about the abuse "when [Thomas W.] put his hands on [the Child], I finally got sick of it so, yes, I did say something to someone about it." Mother stated that Thomas W. "slapped [the Child] in the mouth with an open hand," which caused the Child to bleed. Mother admitted that this incident happened about a week prior to the DCS Child and Family Team meeting during which she finally admitted to the abuse. She also admitted that she did not immediately tell DCS, but rather the meeting went on for some time before Mother admitted to the abuse. Mother stated "I was going to talk to my worker after the meeting had happened, but then I finally just broke down and said something in front of everybody because I was tired of it."

The Child was born in November of 2010. Mother took the Child home from the hospital to Thomas W.'s home. Mother stated:

> [Thomas W.] cussed me out a lot during that time. He hit me a few times after [the Child] was at home, but it was never severely bad until the day that she had thrash [sic] mouth and wanted me to hold her constantly because she was sick and he didn't want me to be babying my daughter…. He told me to put her in the bassinet. I did. He told me that when she started crying for me not to go to her, but my mother instincts wanted to go, so I got up to go, and he popped her in the mouth with an open hand and it busted her mouth. And I cleaned her up…. He stabbed me in the back after I was trying to clean up my daughter to where I could get the blood off of her to have my mom come get her.

-4-

Mother stated that the Child was two months old when this happened. Mother was asked what she did to get out of the situation, and she stated:

> I called my mother and told her that she needed to come pick up [the Child] immediately because I had things I needed to deal with and I could not deal with with her being there, because if I was to leave with her there, he would not have let me go back to get her, he would have kept her. And I had planned on leaving him because he put his hand on my child.… I left him the night that I went to that meeting when I broke out and told everybody what had happened. It was really hard to talk about it because my daughter was there and her foster parents was there and it was kind of hard to discuss things I kept in because I didn't want anybody knowing about them.

Mother testified that she did not go back to Thomas W. after the Child and Family Team meeting. Mother testified that she filed a restraining order against Thomas W. after the meeting, and that she and the Child went to a battered women's shelter where they remained for approximately three weeks before DCS removed the Child from her custody. When questioned further, Mother admitted that the Child and Family Team meeting happened on December 17th, and the Child was taken from her custody on December 22nd. The Child has remained in DCS custody since that time.

Mother testified that she stayed at the shelter for approximately a week after the Child was removed from her custody and then went to stay with her mother. Mother testified that Thomas W. still found her and assaulted her even after she broke up with him. Mother was asked why she went to stay with her mother when she had asserted that her mother failed to protect her, and she stated: "Because my mother has straightened up and she was showing me that she wanted to be there for me and she was helping me through the fact that I was abused and so was she." Mother was asked why she did not remain at the shelter, and she stated:

> Because I was pretty much kicked out of the shelter because I broke the curfew the night that [Thomas W.] found me, and I was like five, ten minutes late getting in because I was trying to hide from him to get back to the shelter because they told me they didn't want anybody to know where that shelter was.

Mother testified that she was asked to leave the shelter "sometime in January because my grandmother died the same month."

When asked how long it was before she became involved with another man, Mother stated: "I had met back up with a guy that I used to date, it was like right before my

grandmother died, which was January the 29th. I think it was like two or three days before she had passed away that I was seeing him." Mother admitted that this new man had anger management issues and was attending an anger management class. Mother stated that her new boyfriend became physically abusive with her, and she left him.

Mother testified that she then became involved with another man, Ricky M. Mother was asked if this was the man wearing a red bandana that she brought to DCS, and she stated: "That would be the guy that I left, that's that guy, [Daryl M.]" Mother admitted that she posed the Child and Anastasia in red bandanas for photographs and told them that daddy likes his girls in red bandanas, referring to Daryl M. Mother stated: "he had previous children with another woman that they did the exact same thing and I thought it was cute.… My children were young and did not know that I was saying Daddy."

Mother admitted that she was involved with Thomas W. in December, with Daryl M. during January, and with Ricky M. in February. Mother testified that she was involved with Ricky M. for two weeks before she moved in with him. Mother testified that she found out in May that she was pregnant with another child, Rebecca. Mother delivered Rebecca prematurely in October at 29 weeks. Rebecca died in November that same year.

Mother admitted that when she was living with Ricky M., Mother referred to him as her husband even though she still was married to Alvin A. She stated: "we were engaged." Mother admitted that she called Ricky M. 'Daddy' during visits with the Child and Anastasia "because I thought that was actually going to work out."

Mother testified that she and Ricky M. separated in September. She stated: "When we had lost Rebecca he was grieving differently than I was. We had an argument, and he placed his hands on my chest and asked me to move out of his doorway so he could shut the door." Mother admitted that Ricky M. had asked her to move out several times before she actually did. Mother was asked if she told people that Ricky M. had broken her wrist, and she stated:

> Didn't say he had broken my wrist. What I said was, when me and him had a disagreement, I slammed everything off of the microwave because his mother was there and I did not want her using my microwave, I was taking it outside, and that's what refractured my wrist, because I hit it really hard.… Why I left his trailer was because we had an altercation and I knew that it was not safe to stay there. I did not say he broke my wrist.… I said we had an altercation, things got heated, I was grabbing my microwave and fractured my wrist. When I was thinking about it, for the three days that I was thinking about it, I came down off of my anger spell and found out that it was my fault why my

wrist was in that brace, and it is in the hospital records that that's what happened.

Mother was asked when she met Luther H., and she stated:

I had met back up with him shortly after [the incident where she fractured her wrist] had happened. We were never in a relationship, but he was taking me to some of the appointments because at the time I did not know he was in trouble and wasn't allowed to be around children.

Mother admitted that Luther H. is a registered sex offender, but claimed she did not know this information until later. She admitted that her attorney told her Luther H. is a sex offender and advised her not to have contact with him, but Mother continued to have contact with Luther H. Mother also admitted that she communicated with Luther H. via Facebook and said "I love you baby, love you hot baby," and signed the message "Your baby mamma." Mother stated that she and Luther H. never had a relationship but communicated in this manner "to get another dude to leave me alone that would not stop." Mother testified that Luther H. continued to take her to see the Child and Anastasia when Mother's mother's car was "broken down." Mother admitted that she was informed that Luther H. was a sex offender in October, and that Luther H. brought her to visitations with her children in November and also took her to some of Anastasia's doctor's appointments. Mother does not have a driver's license. When asked how she knows Luther H., Mother stated: "He was around me growing up. My mom married his cousin, and he was around me my whole childhood life. He used to change my diapers and everything when I was a child." Mother testified that she would not allow Luther H. to be around her children now that she knows he is a sex offender. Mother admitted, however, that she continued to allow Luther H. to drive her to appointments including those at the DCS office even after she learned he was a sex offender. Mother was asked if it was her intention to continue to accept rides from Luther H., and she stated: "No, ma'am, it's not. I've actually got somebody now that has license that is able and that has insurance that can drive me anywhere I need to go until I get my license." Mother testified that this person is Kimberly Crowe, the person she is doing work for. Mother admitted that Luther H. is the second sex offender from whom she has accepted transportation.

Mother testified that she was approximately six weeks pregnant at the time of trial, and that the father of that child was Ricky M. Mother was asked again when she left Ricky M., and she stated: "I left him September the 18th, but after that I had went back up to his house and I had fooled around with him and that's why I'm pregnant." Mother was asked if she was having a baby with another abusive man, and she stated: "Yes. I do not live with him, I have my own place, and have my own money where I can support a child."

A permanency plan for the Child ("the Plan") was developed in January of 2011. The Plan required a drug and alcohol assessment, and Mother testified that she "passed both drug tests that I was given, hair follicle and urine test." Mother testified: "I've never been in jail at all since I've been of age or anytime since." Mother also testified that she completed the victim advocacy classes required under the Plan because she was a victim of partner abuse. Mother also stated that she participated in the required mental health treatment and participated in the therapeutic visitation.

Mother was asked if the Plan required her to pay child support of $40 per month per child, and she stated: "That's what was in the paperwork, but at the Child Support Court they told me to pay what I could afford to pay, and it didn't matter if it was 5 or 10 dollars, as long as I was paying something that's all that mattered." Mother agreed that until May of 2012 there was a large period of time during which she was not paying child support. Mother admitted that an order from the Child Support Court dated August 22, 2012 ordered her to pay $285 per month in child support, but stated: "but they told me to pay what I can afford to pay.… Yes, that's what the order says, but I'm telling you what the judge and the lawyer told me." Mother admitted that she has an arrearage in child support for the Child of over $5,446 for the period of time since the Child came into DCS custody until July 31st. Mother stated:

> I have paid more than $25 on my child. I send $10 in every month on her through a money order through mail, and then I also take, when I have extra money left over out of Anna's appointments and the appointments that I have to go to, I put with that.

Mother testified that she was working and stated: "It's not an over-the-counter job but, yes, I do work, I make money to where I can try to support myself and my children.… I'm working with my mother's roommate in cleaning her house.… I'm cleaning people's houses." Mother testified that she has been doing this since the end of September.

Mother also testified that she is trying to get disability. She stated that she has an attorney working on this for her, but she could not remember the attorney's name. Mother was asked the nature of her disability, and she stated:

> I have an abnormal spine, and there's a few other things that are wrong with me, because I can't read or write, so there's not a lot of people that will hire someone that can't read or write. And I'm not supposed to stand up on my feet for long periods of time because of the fact of my medical history. If I do, my legs start swelling, and I just found out that I have a slight pinched nerve on the right side of my back.… I have severe anxiety. They don't think I can

-8-

work around a whole lot of people because of the fact that they're scared that I'm going to have a nervous breakdown at work. And I have tried working in the past and it's happened.

Mother produced a form from a doctor that Mother asserted stated that her pregnancy with Rebecca was a "severe high risk pregnancy." Mother stated: "I was in the hospital for three weeks, or about three weeks, because afterwards I was back and forth to the hospital with Rebecca. I had to be there, I was breast feeding." Mother was asked if she understood that other people had children and continued to work, and she stated: "Yes, I do, but they have also got support from a spouse too that I didn't have at the time." Mother was asked if she had had support from Ricky M., and she stated: "Yeah, but he was getting a check when Rebecca was born and he was giving me money to come down to the hospital to see the baby and all of that, so that's where his money went because he only got a $300 check every week and that money was usually gone by the time he paid bills."

Mother agreed that DCS encouraged her to leave the Child with Ricky M. while she worked because he was at home receiving workman's compensation at the time and available to help out full-time with child care. Mother stated:

Yes, but my child more wanted me than anybody. She didn't want to be left with him, she cried when she was left with him, so therefore he would drive me to the appointments, and that's how it worked. And I had already been looking at places to where I could put her in daycare when I get her home.

Mother admitted that it was her choice not to leave the Child with Ricky M. "because he was dealing with eye stuff. He couldn't even pick her up because she was so heavy." Mother then admitted that even though Ricky M. "was dealing with eye stuff," he was driving her places.

Mother was asked why she thought she deserved to have the Child, and she stated:

Because I know deep down that I'm a good mom and I can take care of my children…. I have jumped through hoops for DCS, I did everything they asked me to, I went to all the classes they asked me, I have passed all the drug tests that they have asked me to take, I went through everything, domestic violence class, I was actually starting to work - - actually I was working with my mom and her roommate to clean their house to get money to take care of my child, and I know I could take care of my children.

When asked if she had established a safe and stable home, Mother stated: "Not at the time because I kept following with the wrong crew, with the wrong guys." Mother testified that at the time of trial she lived in the projects, and that it was safe and stable. At the time of trial, Mother had been living in her own apartment in the projects for approximately one month.

Mother was asked about telling people stories that she had children when she didn't, and she stated:

> I told them to my mother's ex-boyfriend to make him jealous and to send stuff down here because mom wanted him back. And then I told a case worker that when I went to one of my appointments. I had one of the children with me and I told them that it was my child. It wasn't my child. I told them that because I found out I had cervical cancer and could possibly never have children.

Mother was asked whose child she had with her, and she stated: "The child back in '08 that I had was my cousin, Sarah [A.R.].… That's the name of the cousin, that's the name of the baby that I had." Mother testified that she was taking care of her cousin because the child's mother "was strung out on pills really bad." Mother testified that she never has had a drug problem. Mother admitted that she told people that Sarah A.R. was her child even though she was not.

Mother agreed that Anastasia had been taken into foster care largely because of the lies Mother had told. Mother was asked about telling people at the hospital when she had Anastasia that she had given birth to multiple children who had died, and Mother stated: "I never told anybody. [Thomas W.] is the one that opened his mouth about that, other than the fact of when I had my cousin with me when I was going through Helen Ross McNabb." Mother was asked if Thomas W. believed she had children who had died when he met Mother, and she stated: "Yes, I had pictures of all kinds of babies and he assumed at the time that they were mine, so I just let him believe that.… Yes, because he told me if I could not have kids, because he wanted more, he would leave me, and that's before I found out he was abusive."

Mother testified that she has had several mental health assessments. Mother testified that she underwent a mental health assessment at Helen Ross McNabb, and they gave her a diagnosis of severe anxiety "because of losing Anastasia" and PTSD "because of all of the abuse that I had went through throughout the years." Mother testified that she attends counseling twice a month on her own initiative. Mother also attended the grief counseling recommended by DCS after Rebecca's death. Mother stated: "I did everything that [DCS] have asked me to do, everything." Mother admitted that she told Ms. Grindle,

one of the DCS case workers, that she had been seeing Dr. Manning since she was in the fifth grade because she threatened to kill a teacher, and Mother stated: "That was one of my dumb moments in school." Mother was asked about mental health care she received at Helen Ross McNabb, and she stated: "and I was not on any medication…. At one point in time I was, and then I stopped taking it because I got better." Mother admitted that she reported to a provider at Helen Ross McNabb in December of 2005 that she had two children and that they both had died.

Mother took parenting classes through Foothills Caring, and stated she learned: "[h]ow to pretty much discipline your child and do it in the correct way as in taking things away from them and how to award your child when they do something right, and the nutrition…. To try to get them to eat their fruits and vegetables and try to get them to eat healthy to where they would grow." Mother testified that Foothills Caring also taught her safety tips such as using plugs in wall outlets to keep children from sticking their fingers into the outlets. Mother stated: "I did everything they asked me to do." Mother was asked about her relationship with Renee Stegall[2] from Foothills Caring, and she stated: "We were really, really close. She helped me through a lot. She was even someone that I talked to when I lost Rebecca."

Mother testified that she took domestic abuse classes at the YWCA and learned:

> that it's best if you travel to places in different ordeals instead of going to the exact same place with the same location. I learned that it's not okay for a man to abuse a woman, just as well as it's not okay for a woman to abuse a man, that never to run into the bathroom because more accidents happen there than they would anywhere else, and to always be aware of your location and where you're at.

During the time she was taking these classes, Mother was living with Ricky M. and was pregnant with Rebecca. When asked if she got confused about time, Mother stated: "A lot." Mother left Ricky M. in September of 2012.

Mother was asked why she does not have her driver's license, and she stated:

I never had the money. I was always scared to go get them, and I have

---

[2]Ms. Stegall's name is spelled at some places in the record on appeal as 'Stegal,' and at others as 'Stegall.' Given the record before us on appeal, we are unable to determine the correct spelling. For purposes of uniformity only, we utilize the spelling contained in the Juvenile Court's final order.

problems reading. So my mom's roommate is in the process of helping me study to get my license.… I've never been able to read, I can't read big words. I can read small words. I have to have someone explain things to me to where I understand what it is. I don't write very well. When it comes to big words, I have to get people to help me write letters. It's been like that forever. I graduated with a special ed diploma because I have these learning disabilities.

Carol Lawrence has been the Child's DCS caseworker since September of 2011. Mother had just started or was about to start having unsupervised visitations with the Child when Ms. Lawrence became the caseworker. Ms. Lawrence testified:

When I had taken over the case, [Mother] was pregnant and [Ricky M.] and [Mother] were not married or engaged, I basically - - I guess how I took it is I wanted to see how the unsupervised overnights went. Then because she was a high risk pregnancy and she was having all kinds of issues coming from back [sic] the doctor, I didn't want to send [the Child] anywhere permanently and then have to back up because [Mother] would be in the hospital or something would be wrong with the baby.

So my goal the whole time was to wait until after Rebecca was born, see how they did with Rebecca, and if all of that went well, then decide on the trial home placement. But up until then we would still progress with the unsupervised overnights. And we did progress from one night to two nights to three nights. And then we did - - I don't know if we did any four nights. And then we did a five-night visit in December.… That was at the beginning of December. That was after Rebecca had died and [Mother] was, you know, very distraught and she wanted to have her child with her. So because we were going to ask for an extended visit for her, we requested - - or I requested Foothills to go out to the home also so that I could be out there and that Ms. [Stegall] could go be out there in the home when [the Child] was there that many days. Then Christmas came and she had so looked forward to Christmas with her, but we had had a [Child and Family Team meeting] prior to that that didn't go very well.

Ms. Lawrence was asked why the Child and Family Team meeting was scheduled, and she stated:

It was convened to discuss the trial home placement for [the Child] because Rebecca had passed away, and just to see how things were, see how everybody felt, see if [Mother] was ready. And during the [meeting], the part - - I missed

-12-

part of the [meeting] because I left the room to go get some paperwork. And apparently during that part of the [meeting] things occurred. Prior to that they were talking about Anastasia and her medical appointments and her doctor appointments, and [Ricky M.] was at this [meeting] …. They were calling Dr. Weinstein a quack, I was there for that…. [Mother] and Rick. They were talking over top of people, they were talking over top of the foster mom. We were trying to get information from [Mother] as to did she really know what was actually wrong with Anastasia. And that sparked some tension with [Mother] because, you know, she didn't seem to be able to really tell us Anastasia's problems even though Anastasia had been in custody for a very long time.

I left the room, I went to get some paperwork. When I returned the only thing I witnessed was Ms. Gunn had stood up and said, I am not going to deal with this anymore, there [sic] is ridiculous, there is to be no more visits, no more overnights, no more unsupervised visits. And she left and [Mother] left, and it was quite a scene.

Ms. Lawrence testified that because DCS thought that Mother might be having some issues with grief due to Rebecca's death, DCS asked Mother to attend grief counseling. Ms. Lawrence further explained: "And when she had had a couple of grief counseling sessions, then we would look into maybe starting the unsupervised visitation again."

Ms. Lawrence was asked if she would have allowed Mother to have unsupervised visitation if she were in the home alone, and Ms. Lawrence stated:

Absolutely not…. Because I had always felt all along in the case that although [Mother] loves these girls very much and has been through a lot with this case, even after two years, her basic parenting skills, even with [the Child], were difficult, or it appeared difficult. And I always felt [Ricky M.] had some stability, he seemed to make sense, he kept - - actually it is the best that [Mother] has done since she had been with anybody, was with [Ricky M.], it's as though he grounded her. And if there was any kind of an emergency, I felt that he would make the right decision, not that [Mother] wouldn't, but just for fear that maybe she wouldn't, that he would be there too. And he was not working at the time, he was on workmen's compensation. So as long as [Ricky M.] was in the picture, I felt comfortable to have [the Child] in the home with [Mother].

Mother and the Child were allowed an extended visit of five days around

-13-

Christmas time. The Child continued to have unsupervised visitations with Mother. Ms. Lawrence testified that they slowed down the schedule a little because the Child was having trouble adjusting from visits every weekend, and so the visits were changed to every two weeks for three nights per visit.

Ms. Lawrence testified that she was doing surprise visits to Mother's home while the Child was visiting Mother's home. When asked why, Ms. Lawrence stated:

> Well, I always do surprise visits instead of planned visits, and because [the Child] was in the home, that would be my role, to make sure that everything - - you know, I was concerned and I still wasn't sure about, you know - - I mean, [Ricky M.] and [Mother] were not married, so my biggest fear was at any time he could ask her to leave, you know. I mean, there was no stability, she had no income, no job, not any support. And so I always - - and that's why we put Foothills in the home too, not so much to watch [the Child] as to get a feeling as to what kind of relationship that [Mother] and [Ricky M.] had, you know.

Mother told DCS that she was engaged to Ricky M. and claimed to have been divorced from Alvin A., but this was not true. Mother also used Ricky M.'s last name as her own.

Ms. Lawrence testified that DCS used Facebook to check up on Mother. She stated:

> And [Mother] invited us all to her Facebook page. And I do have it in a [Child and Family Team meeting] that I asked her and told her to be very careful what she posts on Facebook because it is visible. And I was surprised that she was able, and I don't say this disrespectfully, but able to maneuver all of that and get on there and set up herself a Facebook and she did, and I thought, you know - - anyway, looking on the Facebook page, there was a comment made, several comments made, about [Ricky M.] asking her to leave, giving her 30 days to leave, asking her to leave, and that was quite shocking.

These Facebook comments appeared in February or March. Ms. Lawrence knew that Mother had not left [Ricky M.'s] home at that time because Ms. Lawrence had visited her there. Ms. Lawrence testified that a hearing before the Magistrate was held in April, and Ricky M. testified. As a result of that hearing, DCS stopped all unsupervised visitation. Ms. Lawrence explained it was because they

> realized that the relationship [between Mother and Ricky M.] was not stable and at any time, you know - - it wasn't going to move beyond - - to a trial

home placement at that point because it appeared that the relationship was unstable and there was no backup plan, there was no safety plan, there was no where that she could go with [the Child].

Visitation was moved back to the DCS office, and although Ricky M. had attended visits in the past, he never attended another visit. Ms. Lawrence was told that he was not visiting because he had gone back to work.

Ms. Lawrence testified that she had seen postings on Mother's Facebook from another man. She tried to reach Mother and could not, so she became suspicious that something was wrong between Mother and Ricky M. As a result, Ms. Lawrence decided to do a visit to Ricky M.'s home at the end of September on a Sunday when she knew Ricky M. would be at home. Ricky M. was home, and Ms. Lawrence went into the home and looked around and saw that Mother's and the girls' possessions were gone. Mother had moved out and had not complied with the requirement in the Plan to keep DCS apprised of where she was living.

Ms. Lawrence testified that she later saw Mother during a court hearing and spoke with her. Ms. Lawrence stated:

I said, I apologize for not calling you, but I really didn't want to get into a confrontation. And she goes, well, I'm not going to yell at you, I know, I just wanted to talk to you. And I said, well, I said, so what happened? And she said that - - she was very proud of herself, she said that [Ricky M.] had broken her wrist and that she was not going to stay in a home and let any man put a hand on her again, and as soon as he put his hands on her, she was out of there, and that's something that she - - she will never let a man do that to her again, and she was very adamant and very proud of herself.

Mother never told Ms. Lawrence the story about the microwave. Ms. Lawrence also testified that Mother showed up for a visit in early or mid-September with a brace on her wrist and told Ms. Lawrence that she had hurt her wrist moving furniture. Ms. Lawrence was asked what her concern was about Mother's stories, and she stated:

Well, I mean, she was in a horrific relationship with [Thomas W.] where she was abused with Anastasia, while she was pregnant with [the Child], [the Child] was hurt, so to say that somebody assaulted her and broke her wrist, be it true or not, was very alarming because of the situation, and especially because if he actually had broke her wrist two weeks prior to that at the visit or a few weeks prior to that when she had that wrist band on, she never

-15-

mentioned it. She said she was moving furniture, and she was very believable.

So my concern is if it's true that he broke her wrist, that's alarming because it's another domestic violence, and if it's not, claiming that she was involved in domestic violence is not good either. So my concern goes back to the same thing, her judgment and her - - you know, [Mother] likes to change her story based on the decision and the mood and the acceptance that she wants. That's been at least my history with her, my experience with her.... Well, because she did not want me to know obviously that she was put out of that home, so she told me she hurt her wrist moving furniture, whether that was the truth or not, I believed her. Then when she realized that I was out there to [Ricky M.'s] house, and I'm sure he explained the conversation that we had between ourselves, so when I saw her she wanted to let me know why she left, and that it wasn't for the reason he said, I assume. Now, this is all my assumption, but that was how I took it, she couldn't wait to see me to tell me the reason why she left, and her reason was not his reason.

Ms. Lawrence agreed that it alarmed her to hear that Mother continued to have sex with Ricky M. despite reporting that he had broken her wrist.

After leaving Ricky M., Mother got an apartment in Western Heights. Ms. Lawrence visited this apartment and found it to be appropriate. She stated: "She had done a wonderful job getting it ready."

When asked about her concerns, Ms. Lawrence testified:

[W]e have never seen [Mother] have the baby - - I mean, have [the Child] alone. Like I said, the entire time we did all unsupervised visits [Ricky M.] was home at all of the visits. Had he not been home, I don't think we probably would have went forward with many of them. I mean, I can't go back and guess.... And what we predicted to happen did happen. I mean, not predicted, but my fear of that relationship and him putting her out is exactly what happened. I mean, and she didn't come forth and tell us that happened, so she was hiding it obviously because, you know - - it's not like she called and said, oh, my gosh, I had a fight with [Ricky M.] and I have to get out, you know. I mean we had no knowledge of that.

Ms. Lawrence admitted that DCS's main concern is Mother's ability to keep the Child safe from her paramours. She testified: "Even though she has her own place, there is no guarantee that the people around her won't be in that home that aren't safe and stable, and

she's only had that home a month." For example, Luther H. drove Mother to the last visit with the Child.

Ms. Lawrence was asked about what services Mother was provided, and she stated:

> From what I have read back, ETHRA was in the home - - homemaker services were in her home several times, therapeutic visitation was almost three years, then she had in-home services when we put [the Child] on just unsupervised, which we normally don't do. You normally do the in-home services during the trial home placement, but in this case we did put them in during the unsupervised visitation because of our concerns. Gosh, she was provided - - during the course of the case she was provided, I mean, the FSW had gone to Cherokee Health with her, given her bus passes, had made calendars, months and months of calendars, for doctor appointments, she was given a psychological, she had some assessments set up for herself.

Ms. Lawrence explained that the therapeutic visitation stopped after the court hearing in April because Ms. Stegall testified that Foothills no longer had anything to teach Mother, that their services had been exhausted, and that more therapeutic visitation was not going to change the situation.

The Child's foster mother ("Foster Mom") testified that the Child came into her home on December 22, 2010. The Child was six weeks old at that time, and has remained in her home since that time. Foster Mom's home includes her, her husband, their son Juan, and at the time the Child entered their home another foster son. The other foster son left their home in June of 2011. Foster Mom testified that she and her husband want to adopt the Child. Foster Mom was asked about the Child's relationship with her husband, and she stated: "Very close. I mean, she loves both of us and we love her, and there's a strong bond between both."

Juan is three and a half years old, and Foster Mom testified that the Child and Juan "are very close." The Child also has a close relationship with Anastasia. Foster Mom testified: "We see each other at church and Anna's house. We get together for birthday parties, that kind of thing as well.… Typically when we do visitations I'll say, oh, we get to go see Anna today, and [the Child] squeals or is excited to go." Foster Mom explained that she and Anastasia's foster mom "have been friends a long time. I have known the other Mrs. Foster for years, yes. And so if [the Child] remains in our home, if that's something - - the relationship will continue between [the Child] and Anna, as mine with the other Mrs. Foster." Foster Mom further stated: "Our current son was also a foster child that we adopted, and he

has other siblings that are in other homes, and we maintain those relationships as well." She testified that she and her husband maintain contact with the birth parents of their adopted son and "send pictures and we still allow and meet at McDonald's and they play together …." Foster Mom testified that depending upon the circumstances, she and her husband would be open to considering continuing to allow Mother to see the Child.

Overnight visits with Mother began when the Child was approximately ten months old. Foster Mom testified:

In November and December the visits went to where there was even five-day visits at a time, and the difficulty we were having was when she was coming back, just screaming bloody murder, did not want us to leave the room, was clingy if people came over, didn't want us out of her sight, just that sort of thing. At night woke up frequently screaming at night, two or three hours at a time, and it took a good five days from being returned to a visit before she would start sleeping through the night again.

Those issues have not continued since the unsupervised visitation was ended.

Foster Mom testified further about concerns she had while the Child was having overnight visitations with Mother, and stated:

Mostly to the extent of the difficulty [the Child] was having going and back forth, the frequency that was set up with that, the disruption of sleep during that time. On multiple occasions she came back with diaper rash. There was a lot of constipation involved with going back and forth too. So most of all my concerns were in regards to that.

Foster Mom testified that most of the time the rash was "labia rash." She further stated:

At different times there was diaper rash, there was labia rash and bottom rash. In November of last year at one point there was bottom rash that appeared to be yeast and required going to the doctor for treatment. It resulted in three different doctor visits because it ended up being a staph infection, not - - it wasn't responding to the yeast medication. But most of the time it was labia rash, and that occurred frequently, you know, during the visits.

The Child never had labia rash while in Foster Mom's care, but did have some bottom rash. Foster Mom spoke with Mother about the rashes and "at one of the visits [Mother] said that it was because [the Child] was allergic to Huggies diapers." Foster Mom noted that this

conversation happened in February, and then in November the Child came home from a visit at Mother's home wearing Huggies diapers. Foster Mom testified that for a while, the Child was taking a constipation medication to be used on an as needed basis, not everyday.

Foster Mom was at court for a hearing scheduled in October when Mother had a brace on her arm. Foster Mom stated: "[Mother] came up to us and said that she had broken up with Rick because he broke her wrist and therefore she had learned her lesson the first time with Tommy, not to stay in abuse." Foster Mom testified that Mother arrived at court with her mother and Luther H. Foster Mom has seen Luther H. since that time "when I have dropped off or picked up for visitation he has been present, waiting in the car." She stated he was there on the last visit prior to trial on November 16, 2012.

The Child's birthday is around the same time as Mother's birthday. Foster Mom stated: "I got about four or five texts [from Mother] the month of October, reminding me and counting down to [Mother's] birthday coming up." Foster Mom had been told that there would be a combined party, but Mother's communications spoke only of her own birthday.

Foster Mom was asked about a DVD given to her by Mother for the Child, and she stated:

> It's about an hour and 20-some odd minutes of pictures set to music, starting from [the Child's] birth pictures with her in the hospital, going through mostly of [the Child], but also with some with Anna, some at, I assume, is Rick's home, you know, back and forth. And then at the end there is pictures of Rebecca, who was the baby born last year, her sister, in the hospital and of her after she had passed, in her coffin and grave side. And then ones of, I think, was [Mother's] grandmother, is the way it was written, when she had died as well. I believe it's the beginning of this year, those pictures. And then there are several pictures of [Mother], what looks like when she had been abused, of her face, different parts of her body, multiple pictures of those.

There is no warning about the pictures on the end of the DVD. Foster Mom stated that they just appear. This concerned Foster Mom, and she stated:

> It did since it was for [the Child]. I mean, she didn't say this was for [the Child] to look at now or for later. It's something I find disturbing looking at myself, and it's something that I wouldn't - - I'm not comfortable showing those pictures specifically, at the end of the DVD.

Renee Stegall, a Family Preservationist Specialist with Foothills Caring, testified at trial. Ms. Stegall has a Bachelor's degree in psychology, sociology and criminal justice and a Master's degree in criminal justice with an emphasis in juvenile justice and has been doing social work for twenty-seven years. Ms. Stegall testified that she had done therapeutic visitation in this case. She testified that therapeutic visitation involves teaching parenting skills, working with the parent during the visit on those skills, and assisting the parent with community referrals to help get children reunited with their parents.

Ms. Stegall began working with Mother in September of 2011. Ms. Stegall explained that she began working with Mother prior to the unsupervised visitations beginning and continued to work with Mother during those visits. While the Child was with Mother in the home, Ms. Stegall would make at least one visit a week to the home. Ms. Stegall testified:

> The visits themselves were positive. I saw the child interacting with both the mother and Rick, as far as seeking out attention or looking for comfort because there was a stranger in the home. I observed mom to be the primary caretaker if there was feeding time or diaper changing time. There was really no problems in the home except for some nutritional stuff that I reviewed with the mother, you know, more fruits and vegetables because [the Child] was getting constipated, working on that kind of stuff. She made the changes that I asked her to make as far as baby-proofing the home. The biggest issue that I recall was Rick - - or I'm sorry, [Ricky M.] smoking in the home. He didn't do that while I was there, but there was evidence of him still smoking probably when the child was not in the home for her visits.

Ms. Stegall testified that Mother addressed safety issues when asked to do so.

Ms. Stegall testified that her primary concern was with the relationship between Mother and Ricky M. She stated that "the only reason why the mother was doing so well was because [Ricky M.] was providing the housing, the transportation, the income. Mom had not made progress in those areas on her own, or independently." Ms. Stegall talked to Mother about what would happen if Mother's relationship with [Ricky M.] ended "and her backup plan at that time was to go to the homeless shelter or to rely on her mother who was, through prior discussion, she not [sic] appropriate, the maternal grandmother.... Based on issues that the mother had when she was younger, mother was not protective of her."

Ms. Stegall testified that Mother reported that "[h]er primary reason for having children was so that someone would love her." This caused Ms. Stegall concern "because

the children then met an emotional need of the mother; it's not what the mother can do for the child, but what they do for her emotionally." Ms. Stegall gave an example of observing visitations when both children were present. She explained that because the Child would interact with Mother, Mother would meet her needs. In contrast, Anastasia was unable to meet Mother's needs on an emotional level, and was left alone to do things on her own. Ms. Stegall was asked if Mother would have a negative reaction if the Child were not as open with Mother emotionally, and she stated: "I believe that mother would continue to meet the needs of the child physically. I'm just not sure that she would meet the child's needs emotionally if [the Child] were distant from her mother or nonresponsive."

Ms. Stegall thought that Ricky M. was present during all of the visits she observed in the home. Ms. Stegall did not observe Mother alone with the Child.

Mother had been receiving services since 2009, and Ms. Stegall testified the services were stopped because: "Every attempt was made to try to increase the mother's parenting skills, to try to increase the bonding attachment issues between her and Anastasia. There was really no other services that we could provide that was going to make any further improvement." Ms. Stegall was asked what skills Mother lacked, and she testified:

> Honestly I can't say she was lacking in skills in that area. The child's needs were met when they were doing the supervised and unsupervised visits in the home. Mom had made the changes that I asked her to do. The primary concerns for [the Child] was just what if the relationship that mom had did not work, what if she chose another paramour that was not good for her or her children, because she had already demonstrated a history of that.

Foothills Caring provided Mother services from 2009 through April or May of 2012. Ms. Stegall stated that Mother "has never demonstrated that she has been able to be independent on her own as far as housing, income, transportation." Ms. Stegall testified:

> There would be concerns there only because of the medical issues that Anastasia had that [Ricky M.] and [Mother] denied there was any problem. They indicated that the medical issues that Anastasia has were fabrications by the foster mother, she could not describe at a Child & Family Team Meeting what the medical diagnosis were, what those meant, or how she could help her daughter to be better. If [the Child] were to present with any issues, I'm going to guess that mom's attitude would remain the same for her if any medical issues were to come up. And the lack of - - despite role modeling, instructing, and those were every time we had a visit, how to interact with Anastasia to improve that relationship with her daughter, it just - - it didn't happen.

-21-

Ms. Stegall testified that Mother would bring things to the visits, but would not let the children take them home.  For example, Ms. Stegall testified:

I know on Easter she dressed up both girls, brought them Easter baskets, but she took the dresses and baskets back home.  There was a doll that Anastasia real [sic] liked that, I think, had a pacifier.  She would play with those during the visits and mom would take it back.  Anastasia really liked that doll, she would cry.  I think at the birthday of Anastasia I was able to talk mom into letting her have a paper doll set that she had brought for her gift because she really seemed to enjoy that.… [Ricky M.] actually told mother that you should let her keep it.

Ricky M. testified at trial that Mother left his home on September 18, 2012.  He stated that he told Ms. Lawrence that Mother was talking to other men, but denied reporting that Mother was "messing around."  Ricky M. denied breaking Mother's arm and denied putting his hands on Mother in anger.  He did, however, admit that he put Mother out of his home.  Ricky M. testified that he and Mother have continued to have a sexual relationship even though Mother left his home.  He stated that they have sex "[t]hree or four times a week."  When asked why he put Mother out of his home he stated: "[i]rreconcilable differences.…  It means that we didn't agree on the same things at the time."  He stated that they disagreed about "[h]er talking to males."  Ricky M. admitted that he had asked Mother to leave his home two or three times.

Ricky M. testified that he is aware that Mother has reported that she is pregnant with his child.  He was asked if he has any concern that he might not be the father of this child, and he stated: "No.  I can only say what she tells me and believe what she tells me.  I have to trust her and believe that."

Ricky M. and Mother lived together for approximately 18 months.  Ricky M. has owned his home for approximately seven years.  He testified that he works at Tennessee Waste.  He has been with Tennessee Waste since April of 2011.  Ricky M. was on worker's compensation in early 2012, and started work again in May of 2012.  He testified that he was on worker's compensation for ten months.  He explained "I was strapping down a tarp and the end come out of the bungee cord and hit me in the eye and busted my eye."  Ricky M. testified that he has had three surgeries on that eye, and he stated he can now see "2200."  Ricky M. can drive and is back at work.

When asked, Ricky M. testified that he intends to move back in with Mother "eventually, yeah, when the time is right.…  Whenever she can get her divorce and everything straightened out with her life, her divorce and everything, where we can get

married and move on with life." He testified that he loves Mother.

Ricky M. was asked if Mother ever told him stories about dead children talking to her, and he stated: "No, I've never heard anything about that. The only place I heard that was when it was on that paper that I read one time she showed me. So I don't know anything about that. She don't do nothing like that."

Ricky M. testified that while Mother lived with him, she cleaned houses beginning in the summer of 2012. Mother also got food stamps. Mother did not pay Ricky M. rent to live in his home. Ricky M. testified that he "gave [Mother] some money that she had of her own."

After trial, the Trial Court entered its detailed Termination of Parental Rights and Final Decree of Guardianship on January 17, 2013 finding and holding, *inter alia*:

> As a preliminary matter, prior to the beginning of proof [Mother] advised the Court that she desired to surrender her parental rights to the child, Anastasia [N.W.], rather than proceed to trial as to that child. The hearing was then adjourned and [Mother] appeared before the Honorable Tim Irwin, Judge, in chambers, and surrendered her parental rights. A separate order has been entered awarding full guardianship of that child to the Department of Children's Services.

> * * *

> Following [Mother's] surrender of Anastasia, the trial resumed as to [the Child] only. The Court received multiple exhibits and heard testimony from (1) [Mother], (2) Carol Lawrence, the child's case manager, (3) Renee Stegall from Foothills Care, (3) Rick [M.] [[Mother's] former boyfriend], (4) Megan Herscher [Director of Programs, YWCA], (5) Attorney Joy Bennett [appointed to represent [Mother] in the Child Support Division of this Court], and the child's foster mother. The record is full of inconsistencies by [Mother] and admitted lies. She has told different versions of the same event. She has concealed information and admitted lying to medical personnel, to the men in her life, to the Department of Children's Services, and to this Court. These inconsistencies are so startling to the Court that [Mother] is not credible in the eyes of the Court and that lack of credibility cannot be overcome. Upon the proof presented at the hearing and the entire record, the Court finds the following by clear and convincing evidence.

* * *

[The Child] was born during the marriage of [Mother] and Alvin [A.] on November 5, 2010. [Mother] identified Thomas [W.] as [the Child's] biological father. The temporary legal custody of this child was awarded to the State of Tennessee, Department of Children's Services on December 22, 2010 by order of the Juvenile Court of Knox County, Tennessee. She has been in foster care continuously since that date. An order finding the child dependent and neglected was issued by this Court following a hearing on March 22, 2011. The termination petition was filed against [Mother] on June 27, 2012.

* * *

1. The Department's first involvement with [Mother] as an adult occurred in July 2007 due to a referral that a child, Alvin [R.A.] (b.d. 2-14-07), was living in a filthy home with multiple adults and dogs and with drugs being used in the baby's presence. [Mother] was identified as the mother of the child. During the course of the investigation, [Mother] was interviewed several times and reported that she was pregnant and expecting a baby the following December or March; that she had miscarried "Baby Alvin["] in 2005 or 2006; that she had given birth to a daughter in 2000 and the child had been shaken to death by the child's father; and that she had given birth to a son in 2004 who had lived for a year and then died of heart failure. After a diligent search of hospital and health department records, the Department of Children's Services was unable to locate any evidence that any of these children existed and, as there was no child to protect, the Department closed its case.

2. The Department's next involvement with [Mother] occurred when [the Child's] older sibling, Anastasia [W.], was born in October 2009. [Mother] reported to medical staff at the hospital and to the Department that Anastasia was her ninth pregnancy and that she had had five miscarriages and given birth to four other children, all of whom had died. She reported that one of the children had been shaken to death; that another died within three days of his birth; and that she had given birth to twins, male and female, whose names she could not remember, who only lived one and one-half days. She also admitted that she had been hospitalized in the past for psychosis due to hearing the voices of her dead children and that she had not followed up with scheduled out-patient treatment or complied with prescribed medication. During this trial, [Mother] testified that she never told these stories to the Department or to anyone at the hospital. She testified that these stories had been told to hospital staff by her then boyfriend, Thomas [W.] (Anastasia's

father). She testified that she made up these stories and told them to her boyfriend because she wanted attention and wanted people to feel sorry for her and because her [sic] [Thomas W.] wanted children, even though he was not yet in the picture in 2007 when [Mother] first reported those same stories to the Department of Children's Services or as far back as 2004 when [Mother] first began reporting fictional children to her mental health providers at Helen Ross McNabb. Anastasia was removed into foster care in [sic] October 22, 2009, without ever leaving the hospital. She remained in foster care continuously following her removal.

3. As evidenced by the pleadings, [Mother] initially made sufficient progress toward reunification with Anastasia that this child began unsupervised visitation with a transition plan for overnight visits. Concerns about the condition of the home resulted in an agreement that unsupervised visitation would begin at the home of a relative. Then [Mother] and the child's father proposed to use their landlord to provide transportation for the overnight visits despite knowing that this man had been convicted of sex crimes against a minor. Those and other issues led to orders suspending unsupervised visitation.

4. [The Child] was born to [Mother] and Thomas [W.] on November 5, 2010. She went home from the hospital with her parents who were receiving services and monitoring from ETHRA and Foothills. On December 17, 2010, at a Child & Family Team Meeting, [Mother] advised the Department that Thomas [W.] had hit infant [the Child] in the mouth several weeks before to stop her from crying, causing her to bleed. She also reported that [Thomas W.] had punched her ([Mother]), stabbed her, kicked her, and thrown things at her while [the Child] was in the home. She admitted previously lying to the Court and to the Department on more than one occasion about the cause of earlier injuries. For example, she had appeared in Court on August 4, 2010, and testified that her bruises on that day were from being beaten up during a robbery. She now attributes those bruises to abuse by [Thomas W.]. Pictures of those injuries, inflicted while [Mother] was pregnant with [the Child], were subsequently posted on Facebook, burned onto a CD by the mother, and entered into evidence at this hearing. [Mother] was transported to a shelter following the Child & Family Team Meeting and the Department of Children's Services sought an order prohibiting any contact between [Thomas W.] and [the Child]. The Court responded by issuing a Bench Order removing the child into foster care because "there is a history of domestic abuse/violence between mother and father. The child's older sibling … is currently in the custody of Tenn. DCS. The father is alleged to have hit [the Child] in the mouth. The Court is not convinced that the mother would be protective of the

child and the Court cannot ensure the safety of the child if the child remains in the care and custody of the mother."

5. [Mother's] relationship with Thomas [W.] is not her first or only relationship with an abusive partner. She remains married to Alvin [A.] although she is separated from him. She described him as abusive due to his drug use and reported that he hit her with a baseball bat and caused her to be hospitalized on several occasions in at least three different facilities. She began a relationship with Thomas [W.] in May 2008. According to her testimony during this trial, he was physically abusive to her not only during her pregnancy with [the Child] but also during her previous pregnancy with Anastasia, when he choked her and pulled out her hair. (She had specifically denied any domestic violence when interviewed at the time of Anastasia's birth.) She nevertheless remained with him and brought her children into his home. While Anastasia was asleep in the home during an unsupervised visit, [Thomas W.] "busted" [Mother's] nose. She did not report that violence and she did not leave him. Instead she reported that a black man had assaulted her and that someone had raped her. She testified that she did not understand those stories were wrong. [Thomas W.] slapped infant [the Child] in the mouth, causing it to bleed, and [Mother] still did nothing. Only after he hit her in the head again and beat her badly immediately prior to a scheduled Child & Family Team Meeting did she finally disclose this violence and reveal that her home with Thomas [W.] was not at all safe for her or her children.

6. [Mother] was asked to leave the shelter due to violating curfew. She moved into her mother's home, a place she had already identified as unsafe due to her mother's substance abuse and issues from [Mother's] own childhood and her mother's failure to protect her from an abusive stepfather. While living with her mother she met back up with a man she had dated before. She had a brief relationship with him. He was attending anger management classes and her mother provided his transportation. She identified him to her children as "daddy". According to [Mother], that relationship lasted only briefly because he was abusive. She met Rick [M.] in February 2011 and dated him for two weeks before moving into his home. He was a friend of her mother's and she had actually known him for about six years. In May 2011 she learned that she was pregnant with his child. That child was born in October 2011 at 29 weeks gestation and lived only 19 days. [Mother's] relationship with [Ricky M.] was and continues to be rocky. He asked her to move out several times but each time they worked things out. He finally put her out on September 18, 2012. [Mother] has told various stories to different people at different times about her relationship with [Ricky M.], including reporting that he broke her wrist. After she was evicted from [Ricky

M.'s] home [Mother] informed the Department that her relationship with [Ricky M.] had never been a stable one. [Mother] began a relationship with Luther [H.] shortly after being evicted from [Ricky M.'s] home. She was informed that he was a registered sex offender and stated she would never allow him around her children yet she continued to rely on him for transportation to visits with those children. She acknowledged that [Luther H.] is actually the second registered sex offender on whom she has relied for assistance. [Mother] is currently pregnant and insists that she is carrying [Ricky M.'s] child because she went back and "fooled around" with him after leaving his home. They now have sex several times a week although they report they are not living together. [Mother] is now living in her own subsidized apartment in Western Heights where she has been for one month.

7. [Mother] submitted to a psychological evaluation in February 2010. The evaluator found her to be grossly immature and quite limited in daily living skills. She told him stories as well. He concluded that "she would have difficulty negotiating the day-to-day demands of her child given her intellectual and academic limitations. She would be capable of learning routine tasks and, with structure and supervision, might be able to carry out her responsibilities at a very basic level. Her emotional maturity, since that is what I think best characterizes her fabrications, certainly suggest limits in ability to recognize and meet other[']s needs, especially her child. She would likely tend to see the child as meeting her own needs to finally have someone to love her. This certainly suggests she would have difficulty being an adequate parent for her child and would require considerable help and intervention to accomplish this." The evaluator also found that [Mother] "has little sense of the consequences of her behavior" which is borne out by her continued relationships and involvement with men who are abusive to her or have a history as sex offenders and who pose a substantial risk of harm to her and to her children. It is also borne out by the DVDs she provided to the foster mothers for both of her children with the instruction that they were "for the children". Both discs begin with happy pictures of the children as infants and follow them as they grow into toddlers but end, without warning, with graphic pictures of [Mother] beaten and bruised along with mug shots of the children's father from a local newspaper. The discs were produced and provided with little thought as to the effect the graphic violent images might have on the children. The discs also appear to be another instance of [Mother's] inability "to see others except in terms of her immediate needs", and her need to "gain some degree of sympathy from others" – in this case sympathy from her children when they view the [Mother] as a victim. Records from Helen Ross McNabb show that [Mother] has a lengthy history of sporadic treatment for mental illness. She is described by several

psychiatrists as having a variety of symptoms that could meet criteria for a number of disorders, including Bipolar Disorder, Post-Traumatic Stress Disorder, Oppositional Defiant Disorder, Eating Disorder, some Dissociative Disorder, and some Somatoform Disorder. She has fabricated reports of pregnancy and deceased children for years. McNabb's evaluator in 2009 reported that "it is unclear to this writer if client has some delusional disorder with regard to reported pregnancies and [']lost babies['] or if this is some aspect of her borderline personality disorder, perhaps some attempt to not be alone …[.] This should be addressed by treatment providers after some rapport is established with client and ideally, when she is not accompanied by her boyfriend or some significant other." She has been referred repeatedly for therapy, case management, and medication management but has never complied on a consistent basis. During this case she participated in individual counseling at Cherokee and in specialized grief counseling after the death of her newborn in the fall of 2011. She also participated in a support group for victims of domestic violence at the YWCA from March through July 2011, while living with [Ricky M.].

9. [Mother] also received extended services through ETHRA on two occasions to assist her in remedying the conditions of her home. She was completely unsuccessful in that task while living with [Thomas W.]. She received in-home services from Foothills for over three years. Renee Stegall began providing therapeutic visitation in September 2011. [Mother] said she learned about nutrition and safety precautions, such as wall plugs. Ms. Stegall, who has extensive experience in social work and teaching parenting skills, observed no significant safety issues in the home where [Mother] was living with [Ricky M.] or in [Mother's] care of [the Child] during supervised visits. On the other hand, [Mother] had never been able to comprehend the medical issues of her other child or the care required for her and there was no assurance that she would be able to respond appropriately to [the Child] if she developed similar issues. Ms. Stegall's primary concern was the stability of the relationship between [Mother] and [Ricky M.]. He provided the home, the transportation, and the stability, and the relationship was rocky. [Mother] had been asked to leave on several occasions and her back-up plan was to go to a shelter or back to her mother's, a home she knew to be inappropriate based on her own abuse as a child. As it turned out, that is exactly what happened. Ms. Stegall was also concerned that [Mother] was using the children to meet her own emotional needs rather than focusing on the needs of the children. She brought items (dolls, Easter outfits) to visits for the children but then would not let the children take them home and had no recognition of the distress this caused. Attempts to improve [Mother's] judgment and her awareness of her

children's needs were unsuccessful.

10. [Mother] has paid a total of $85 in child support for this child during her entire time in foster care. During the four months prior to the filing of this petition, she made two payments of $10 each, one in May 2012 and one in June 2012. The only payment prior to that was a payment of $5 made in August 2011. [Mother] was aware of her child support obligation. As of July 31, 2012, she was in arrears more than Five Thousand Dollars. During the four months prior to the filing of the termination petition, [Mother] was living in [Ricky M.'s] home and being supported by him. She had no expenses. She was receiving food stamps. She was working "under the table" cleaning houses and babysitting yet claimed that she could not contribute anything toward child support because [Ricky M.] would not give her any money for that purpose. She appeared in the Child Support Division of this Court on February 13, 2012, and was ordered to provide medical documentation of any issues she claimed prevented her from working. She failed to do so, resulting in the arrearage order issued on August 11, 2012.

* * *

1. Upon those facts, the Court finds that [Mother] has abandoned this child in that [Mother] has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of the petition in this cause. The court finds that the amount paid and the frequency of payments could be considered token support at best. No evidence has been presented to the Court that would indicate that there was any medical reason that prevented the mother from having employment and paying support. To the contrary, the evidence established that she was working. Compliance with T.C.A. 36-2-403(a)(2)(B) was established (a) by the order entered as the result of the permanency hearing on July 27, 2011, which found that [Mother], who was present at the hearing, was informed that failure to support the child could result in the termination of her parental rights and that the Criteria and Procedures for Termination of Parental Rights had been provided to the mother and (b) by [Mother's] signature on the Criteria and Procedures for Termination of Parental Rights.

2. The Court further finds that the child has been removed by order of this Court for a period of six (6) months; the conditions which led to her removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at an early date so that this

child can be returned to [Mother] in the near future; the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home. The Court questions [Mother's] ability to protect her child from bad situations with the men in her life. She testified about the three significant relationships she has had with men in her life. She is still married to Alvin [A.]; she claims he was physically abusive towards her. She testified that [the Child's] father, Thomas [W.], was physically abusive towards her and there is ample evidence in the record to support those claims. In December 2010, [Mother] finally admitted, under some duress at a Child and Family Team Meeting, that [Thomas W.] had been abusive towards her and that he had physically abused [the Child]. After being "rescued" from [Thomas W.'s] home, she became involved with Rick [M.], the third man she reported was physically abusive towards her. He put her out of the home they were sharing. She has now had her own home for only a month, continues to see [Ricky M.] three or four times a week, and reports that she is six and a half weeks pregnant with his child. [The Child] was removed in 2010 due to domestic violence between the mother and the man in her life which resulted in an injury to [the Child] and due to the Court's concerns about [Mother's] ability to protect [the Child] from further abuse. The conditions that were present at the time of [the Child's] removal are clearly present today. It may not be the same man, and she may not be being beaten as badly, but the same conditions are present and the risk is too great to allow [the Child] to be placed back in the mother's home.

3. The Court further finds that [Mother] is incompetent to adequately provide for the further care and supervision of the child because [Mother's] mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [Mother] will be able to assume the care of and responsibility for the child in the near future. When the mother's psychological evaluation completed by Dr. William MacGillivray is taken along with the records of the years of the mother's mental health treatment at Helen Ross McNabb, her multiple diagnoses, her lack of progress, her dismissal for noncompliance, her stopping and starting medication, the delusional type lies she has told to medical and psychological providers and to people in this courtroom, and the domestic violence which has continued during the three significant relationships with men in her life, it is clear that [Mother] suffers from mental illness and that, despite years of treatment, she is not strong enough emotionally or mentally to adequately and safely care for this child.

* * *

1. [Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home despite reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible. Although there is some bond between [the Child] and her mother, and the Court believes [Mother] loves the child, the Court finds that a change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional, psychological and medical condition. Her psychological home is with her foster family where she has lived virtually all of her life. [Mother] has neglected this child and has failed to protect her from physical abuse. She has herself been the victim of brutality, physical and emotional or psychological abuse, inflicted on her by the men with whom she was living. [Mother] has had her own apartment for one month. That period of time does not inspire confidence that she can provide a healthy and safe physical environment when lack of stability has been a significant safety factor in this case. [Mother's] mental and/or emotional status would be detrimental to the child or prevent [Mother] from effectively providing safe and stable care and supervision for the child. And she has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

2. Parental rights of Alvin [A.] to this child were terminated by order of this Court on September 4, 2012. Parental rights of Thomas [W.] to this child were terminated by order of this Court on August 8, 2012.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.

4. [The Child] needs need [sic] permanency and consistency. She is entitled to a safe, secure and loving home. She needs to know where she is going to lay her head every night and who is going to be there. [The Child] has found such a home with her foster family where she is thriving and where she has the opportunity to achieve permanency through adoption.

5. It is, therefore, in the best interest of [the Child] and the public that all of [Mother's] parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place her for adoption and to consent to such adoption in loco parentis.

Mother appeals the termination of her parental rights to the Child to this Court.

## Discussion

Although not stated exactly as such, Mother raises four issues on appeal: 1) whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1); 2) whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3); 3) whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(8); and, 4) whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

> Termination of parental or guardianship rights must be based upon a

finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Before we address the issues raised by Mother, we note that the Juvenile Court found:

> The record is full of inconsistencies by [Mother] and admitted lies. She has told different versions of the same event. She has concealed information and admitted lying to medical personnel, to the men in her life, to the Department of Children's Services, and to this Court. These inconsistencies are so startling to the Court that [Mother] is not credible in the eyes of the Court and that lack of credibility cannot be overcome.

As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn.

-33-

2011). The Juvenile Court specifically found Mother not credible. As the Juvenile Court had the opportunity to observe Mother's demeanor and hear her in-court testimony, we give the Juvenile Court's finding regarding Mother's complete lack of credibility considerable deference on appeal.

We first consider whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1). As pertinent to this appeal, Tenn. Code Ann. § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2012). In pertinent part, Tenn. Code Ann. 36-1-102 provides:

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102 (1)(A)(i) (2010).

With regard to this issue, the Juvenile Court specifically found and held:

> [Mother] has paid a total of $85 in child support for this child during her entire time in foster care. During the four months prior to the filing of this petition, she made two payments of $10 each, one in May 2012 and one in June 2012. The only payment prior to that was a payment of $5 made in August 2011.

-34-

[Mother] was aware of her child support obligation. As of July 31, 2012, she was in arrears more than Five Thousand Dollars. During the four months prior to the filing of the termination petition, [Mother] was living in [Ricky M.'s] home and being supported by him. She had no expenses. She was receiving food stamps. She was working "under the table" cleaning houses and babysitting yet claimed that she could not contribute anything toward child support because [Ricky M.] would not give her any money for that purpose. She appeared in the Child Support Division of this Court on February 13, 2012, and was ordered to provide medical documentation of any issues she claimed prevented her from working. She failed to do so, resulting in the arrearage order issued on August 11, 2012.

* * *

1. Upon those facts, the Court finds that [Mother] has abandoned this child in that [Mother] has willfully failed to support or make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the filing of the petition in this cause. The court finds that the amount paid and the frequency of payments could be considered token support at best. No evidence has been presented to the Court that would indicate that there was any medical reason that prevented the mother from having employment and paying support. To the contrary, the evidence established that she was working. Compliance with T.C.A. 36-2-403(a)(2)(B) was established (a) by the order entered as the result of the permanency hearing on July 27, 2011, which found that [Mother], who was present at the hearing, was informed that failure to support the child could result in the termination of her parental rights and that the Criteria and Procedures for Termination of Parental Rights had been provided to the mother and (b) by [Mother's] signature on the Criteria and Procedures for Termination of Parental Rights.

The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's findings made by clear and convincing evidence. We find no error in the Juvenile Court's determination that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(1).

We next consider whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(3) provides:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2012).

In her brief on appeal, Mother argues that "there has never been clear and convincing evidence finding that [the Child] should have been removed from Mother's home." Copies of the pleadings and orders from the dependency and neglect proceeding pertaining to the Child were entered as an exhibit at trial, including the Protective Custody Order entered on October 26, 2009, which named Mother, Thomas W., and Alvin A. as respondents and found, *inter alia*, that "[t]here is probable cause to believe that [the Child] is dependent and neglected pursuant to T.C.A. § 37-1-102(b)." The fact that Mother contested this finding made at a preliminary hearing does not negate the fact that the Child was removed by order of a court after being found dependent and neglected.[3]

In her brief on appeal, Mother attempts to analogize the facts in this case to the

_____

[3]Mother has confused the required standards. While a court must find that grounds for termination exist by clear and convincing evidence, there is no requirement that the findings made in required underlying proceedings have been made by clear and convincing evidence. As this Court explained in *In re: Audrey S.*, during a preliminary hearing, such as the one in this case which led to the entry of the October 26, 2009 Protective Custody Order, "[t]he juvenile court is allowed to consider reliable hearsay in making its decision, Tenn. R. Juv. P. 16(a), and it can order the child removed from the parent's custody based on a finding of 'probable cause' that the child is a dependent, neglected, or abused child, Tenn. Code Ann. § 37-1-114(a)(2) (2001)." *In re: Audrey S.*, 182 S.W.3d 838, 875 (Tenn. Ct. App. 2005) (footnote omitted). In pertinent part, Tenn. Code Ann. § 36-1-113(g)(3) requires that in order to terminate parental rights pursuant to this subsection that a court must find by clear and convincing evidence, among other things, that "[t]he child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months …." Tenn. Code Ann. § 36-1-113(g)(3). In the case now before us, the Juvenile Court found by clear and convincing evidence that the Child had been removed by order of a court finding the Child to be dependent and neglected.

facts in *In re: Audrey S.*, wherein this Court reversed the trial court's holding that grounds to terminate the mother's parental rights on the ground of persistent conditions existed, based upon the lack of an order adjudicating the child dependent and neglected or abused. *In re: Audrey S.*, 182 S.W.3d 838, 876 (Tenn. Ct. App. 2005).[4] *In re: Audrey S.* is distinguishable from the instant case, however, because in *In re: Audrey S.* there was no finding of dependency and neglect or abuse. *Id.* at 875-76. In the case now before us on appeal, the October 26, 2009 Protective Custody Order contains an explicit finding of dependency and neglect. As such, *In re: Audrey S.* is not controlling with regard to the issue now before us.

The Juvenile Court made specific and detailed findings relative to the issue of whether grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) had been proven including:

> The Court questions [Mother's] ability to protect her child from bad situations with the men in her life. She testified about the three significant relationships she has had with men in her life. She is still married to Alvin [A.]; she claims he was physically abusive towards her. She testified that [the Child's] father, Thomas [W.], was physically abusive towards her and there is ample evidence in the record to support those claims. In December 2010, [Mother] finally admitted, under some duress at a Child and Family Team Meeting, that [Thomas W.] had been abusive towards her and that he had physically abused [the Child]. After being "rescued" from [Thomas W.'s] home, she became involved with Rick [M.], the third man she reported was physically abusive towards her. He put her out of the home they were sharing. She has now had her own home for only a month, continues to see [Ricky M.] three or four times a week, and reports that she is six and a half weeks pregnant with his child. [The Child] was removed in 2010 due to domestic violence between the mother and the man in her life which resulted in an injury to [the Child] and due to the Court's concerns about [Mother's] ability to protect [the Child] from further abuse. The conditions that were present at the time of [the Child's] removal are clearly present today. It may not be the same man, and she may not be being beaten as badly, but the same conditions are present and the risk is too great to allow [the Child] to be placed back in the mother's home.

The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that clear and convincing evidence existed of grounds to terminate Mother's

---

[4]The *In re: Audrey S.* Court affirmed the termination based upon other grounds.

parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Next, we consider whether the Juvenile Court erred in finding that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(8). As pertinent to this issue, Tenn. Code Ann. § 36-1-113(g)(8) provides:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated;

Tenn. Code Ann. § 36-1-113(g)(8) (Supp. 2012).

In her brief on appeal, Mother argues that "[a] finding of incompetence by the trial court must be predicated on expert evidence." In support of this assertion, Mother relies upon *In re: J.W.L. and J.R.G.*, M2007-00167-COA-R3-PT, 2007 Tenn. App. LEXIS 604 (Tenn. Ct. App. Sept. 25, 2007), *no appl. perm. appeal filed*. Mother, however, has completely overlooked the fact that *In re: J.W.L. and J.R.G.* was specifically designated as a Memorandum Opinion, which "shall not be published, and shall not be cited or relied on for any reason in any unrelated case." *Id.* at **1-2.

As this Court clearly stated in *In re: B.L.S.C., D.L.S. & D.J.C.*:

[The mother] emphasizes the State's failure to introduce expert

-38-

testimony that her mental illness makes her unable to care for her minor children. She cites no authority, and we know of none, that requires the State to put on expert testimony on the issue of the effect of a parent's mental illness on his or her ability to parent children.

*In re: B.L.S.C., D.L.S. & D.J.C.*, No. M2008-02301-COA-R3-PT, 2009 Tenn. App. LEXIS 283, at *20 (Tenn. Ct. App. April 7, 2009), *no appl. perm. appeal filed*. Mother's assertion that the Juvenile Court's finding of incompetence must be overturned because it was not predicated on expert evidence is simply incorrect.

With regard to the issue of whether grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(8) were proven, the Juvenile Court specifically found by clear and convincing evidence:

> that [Mother] is incompetent to adequately provide for the further care and supervision of the child because [Mother's] mental condition is presently so impaired and is so likely to remain impaired that it is unlikely that [Mother] will be able to assume the care of and responsibility for the child in the near future. When the mother's psychological evaluation completed by Dr. William MacGillivray is taken along with the records of the years of the mother's mental health treatment at Helen Ross McNabb, her multiple diagnoses, her lack of progress, her dismissal for noncompliance, her stopping and starting medication, the delusional type lies she has told to medical and psychological providers and to people in this courtroom, and the domestic violence which has continued during the three significant relationships with men in her life, it is clear that [Mother] suffers from mental illness and that, despite years of treatment, she is not strong enough emotionally or mentally to adequately and safely care for this child.

The evidence in the record on appeal does not preponderate against these findings made by clear and convincing evidence. We find no error in the Juvenile Court's determination that clear and convincing evidence existed of grounds to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(8).

Finally, we consider whether the Juvenile Court erred in finding that clear and convincing evidence existed that it was in the Child's best interest for Mother's parental rights to be terminated. As pertinent to this issue, Tenn. Code Ann. § 36-1-113(i) provides:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but

is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2012).

The record on appeal reveals that the Juvenile Court considered all of the relevant non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i), among other relevant evidence, when considering the best interest of the Child. The evidence in the record on appeal, as discussed more fully above, does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that:

[Mother] has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home despite reasonable efforts by available social services agencies for such

-40-

duration of time that lasting adjustment does not reasonably appear possible. Although there is some bond between [the Child] and her mother, and the Court believes [Mother] loves the child, the Court finds that a change of caretakers and physical environment is likely to have a detrimental effect on the child's emotional, psychological and medical condition. Her psychological home is with her foster family where she has lived virtually all of her life. [Mother] has neglected this child and has failed to protect her from physical abuse. She has herself been the victim of brutality, physical and emotional or psychological abuse, inflicted on her by the men with whom she was living. [Mother] has had her own apartment for one month. That period of time does not inspire confidence that she can provide a healthy and safe physical environment when lack of stability has been a significant safety factor in this case. [Mother's] mental and/or emotional status would be detrimental to the child or prevent [Mother] from effectively providing safe and stable care and supervision for the child. And she has not paid child support consistent with the child support guidelines promulgated by the Department of Human Services pursuant to T.C.A. 36-5-101.

We find no error in the Juvenile Court's determination that it is in the best interest of the Child for Mother's parental rights to be terminated.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Linda J.M.A.


_____
D. MICHAEL SWINEY, JUDGE